IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| *Plaintiff,* | : | Case No. 1:23-cr-117 |
| | : | |
| v. | : | Judge Jeffery P. Hopkins |
| | : | |
| JOSEPH HARRIS, | : | |
| | : | |
| *Defendant.* | : | |
| | : | |

## OMNIBUS OPINION & ORDER

A federal grand jury indicted Defendant Joseph Harris ("Defendant" or "Harris") on December 6, 2023, on one count of possession of a firearm by a prohibited person in violation of 18 U.S.C. § 922(g)(1). Doc. 1. The facts underlying the offense are concerning. The Government alleges that Harris discharged a firearm in a dangerous or threatening manner while engaged in a shootout near a playground located by a housing complex. Until recently, Harris was represented by counsel. But he has since jettisoned his attorney, asserted his right to self-representation, and, effectively or not, is advocating for himself, as of February 12, 2025. Harris has filed several pro se motions, which the Court will now address.[1]

### I.   PENDING MOTIONS

#### A.   Speedy Trial Act and Sixth Amendment Violations (Doc. 42)

The Court turns first to Harris's motion alleging violations of the Speedy Trial Act and the Sixth Amendment. As demonstrated below, no such violations have occurred.

---

[1]   The Court requested of Harris at least two times that he file an omnibus motion rather individual motions on each issue that he intended to raise. *See* Minute Entries, 2/12/25 and 3/4/25. He did not heed that request. That said, the Court will address each of his motions here.

### 1. The Speedy Trial Act

The Speedy Trial Act (the "Act") mandates that "trial shall commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs." 18 U.S.C. § 3161(c)(1). Harris was indicted on December 6, 2023. *See* Doc. 1. He subsequently appeared before Magistrate Judge Karen L. Litkovitz for his initial appearance on December 20, 2023, so the speedy trial clock began to run on that date pursuant to 18 U.S.C. § 3161(c)(1). *See* Minute Entry, 12/20/23. One day later, Harris was arraigned. The arraignment qualifies as a proceeding concerning Harris so that day is excluded from the speedy trial clock. *See United States v. Crawford*, 982 F.2d 199, 203 (6th Cir. 1993) (citing 18 U.S.C. § 3161(h)(1)). The first day of the event that triggers the period is also excluded, meaning that the first countable day was December 22, 2023. *See* Fed. R. Crim. P. 45(a)(1)(A). The clock ran until January 19, 2024, when the parties submitted a joint status report requesting a continuance so that they be allowed to engage in discovery and either negotiate a plea agreement or prepare for trial. This Court issued an order granting that request and excluding the duration of the continuance under the speedy trial clock. Doc. 17. That order excluded time from January 19 until February 22, 2024.[2] *Id*.

The Speedy Trial Act which has served as the guidepost in these pretrial proceedings further provides that certain periods of delay "shall be excluded . . . in computing the time within which the trial of any such offense must commence." 18 U.S.C. § 3161(h). Included within that provision is an exclusion of time for any period of delay "resulting from any

---

[2] In its response, the Government explains that time was excluded from January 23 until February 22, 2024. Doc. 46, PageID 158. Though the ends of justice order was docketed on January 23, 2024, the Court expressly excluded time from January 19, 2024, the date of the joint status report.

pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion." 18 U.S.C. § 3161(h)(1)(D). Yet even then, § 3161(h)(1)(H) excludes another 30 days while a pretrial motion is "under advisement" (*i.e.*, while the court is deciding the motion). *Henderson v. United States*, 476 U.S. 321, 329 (1986).

Harris moved to be let out of detention on January 22, 2024. Doc. 16. Accordingly, the speedy trial clock was also tolled (*i.e.*, stopped running) pursuant to § 3161(h)(1)(D). *See e.g., United States v. Tolliver*, 949 F.3d 244, 247 (6th Cir. 2020) (per curiam) (excluding time under § 3161(h)(1)(D) while a motion for bond was pending; *United States v. Shinholster*, 64 F. App'x 928, 931 (6th Cir. 2003) (same). By that time, when accounting for the Court's ends of justice order tolling time from January 19, 2024, 28 non-excludable days had elapsed.[3] On January 31, 2024, the Government responded to Harris's motion. Doc. 18. As such, the speedy trial clock remained tolled until March 1, 2024, under § 3161(h)(1)(H). By operation of law, the speedy trial clock restarted on March 2, 2024. Then on March 18, 2024, the parties jointly submitted a status report to the Court. By that time, another 16 non-excludable days had elapsed from the speedy trial clock, for a total of 44 non-excludable days. In that report, the parties represented that they had begun plea negotiations but requested another brief continuance of 30 to 45 days to continue plea negotiations. Neither the Government, nor Harris objected to the speedy trial clock being tolled until April 26, 2024. The Court therefore issued an ends of justice order excluding time from March 18 until April 26, 2024. Doc. 20.

Also, however, during that period Harris's counsel, who had previously contemplated withdrawing, on March 19, 2024, moved to withdraw. *See* Doc. 19. A motion to withdraw as

---

[3] *See United States v. Cope*, 312 F.3d 757, 777 (6th Cir. 2002) (noting that the day on which a motion is filed and the day on which the court rules on a motion are excluded from the calculation).

counsel likewise qualifies as a pretrial motion under § 3161(h)(1)(D). *See United States v. Caldwell*, No. 22-3547/3931, 2023 WL 5021548, at *3 (6th Cir. Aug. 7, 2023) (counting motion to withdraw as counsel for the defendant as a pretrial motion under § 3161(h)(1)(D)). Consistent with this Court's practice, the Court set a hearing on the motion to withdraw for May 10, 2024. Therefore, under § 3161(h)(1)(D), the speedy trial clock was tolled from March 19, 2024, the date the motion was filed, until May 10, 2024, the date that the Court held the hearing on and disposed of, defense counsel's motion to withdraw. *See* Minute Entry, 5/10/24.

The speedy trial clock has not restarted. Since May 10, 2024, the Court has entered a series of ends of justice orders following requests for continuances by Harris's former, and now standby, counsel. The Court found that failure to grant the continuances would deprive the parties of reasonable time necessary for effective preparation, and thus would likely lead to a miscarriage of justice following receipt of these reasonable continuance requests:

- To review discovery and consult Harris resulting in an exclusion of time from May 10 until June 14, 2024. *See* Doc 22.

- To continue to review discovery and determine if any supplemental discovery was outstanding resulting in an exclusion of time from June 14 until July 25, 2024. *See* Doc. 25. During that time, Harris moved for an order for DNA discovery, which the Court granted on June 25, 2024. *See* Docs. 23, 26.

- To review DNA discovery, consult an expert, and file pretrial motions resulting in an exclusion of time from July 25 until August 27, 2024. *See* Doc. 27. During this period, Harris requested to stay the pending motion deadline and for an in-person status conference. *See* Doc. 28.

4

- To allow the defense expert time to review DNA discovery resulting in an exclusion of time from August 27 until October 29, 2024. *See* Doc. 29. In the interim, the Court considered disagreements between Harris and counsel related to pretrial motions that Harris wished to pursue. *See* Doc. 30.

- To allow time for the Probation Office to complete a presentence investigation report upon Harris's notification of his intent to plead guilty and his request for a comprehensive plea and sentencing hearing. This resulted in an exclusion of time from October 29 until March 4, 2025. *See* Doc. 31.

More recently, on February 12, 2025, this Court held a *Faretta* hearing. During that hearing, the Court granted Harris's request to represent himself in these proceedings. Upon consultation with Harris, the Court elected to bifurcate the pending change of plea and sentencing hearing and set this matter for a change of plea hearing only on March 4, 2025. Neither the Government, nor Harris—acting *pro se*—objected to the speedy trial clock being tolled from February 12 until March 4, 2025, so this Court made an ends of justice finding excluding that time from the speedy trial clock. *See* Doc. 37.

Since that hearing, Harris began filing the instant pretrial motions and also requested an extension of time to file more motions. Because of the latter request, the Court converted the change of plea hearing to an in-person status conference on March 4, 2025. *See* Doc. 43. At that conference, the Court granted Harris's request for an extension of time to file more pretrial motions upon receipt of certain hearing transcripts and agreed to set an in-person status conference about 14 to 21 days after the Government responded to Harris's other pretrial motions. *See* Minute Entry, 3/4/25. Although the speedy trial clock remained tolled as a result of Harris's motions, neither Harris, nor the Government objected to the speedy

5

trial clock being further tolled through the date of that conference beyond the time that is automatically excluded under §§ 3161(h)(1)(D), (h)(1)(H).

The cumulative effect of all these events (the filing of motions, responses, and excluded time) means that only 44 days have elapsed from the speedy trial clock. Accordingly, well short of the 70-day bar, no violation of the Speedy Trial Act has occurred.

## 2. The Sixth Amendment

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial[.]" U.S. Const. amend. VI. When deciding whether a Sixth Amendment violation has occurred, the Supreme Court instructs trial courts to consider four related factors amid any other relevant circumstances: (1) whether the delay was uncommonly long; (2) the reason for the delay; (3) whether the defendant asserted his right to a speedy trial; and (4) whether prejudice to the defendant resulted. *Barker v. Wingo*, 407 U.S. 514, 530 (1972); *United States v. Sutton*, 862 F.3d 547, 559 (6th Cir. 2017). None of these factors are dispositive. *Sutton*, 862 F.3d at 559.

The first *Barker* factor, length of the delay, "is a triggering mechanism." *United States v. Brown*, 498 F.3d 523, 530 (6th Cir. 2007). Here, more than one year has passed since Harris was indicted on December 6, 2023.[4] *See* Doc. 1. Under these circumstances, a "one-year delay is presumptively prejudicial and triggers analysis of the remaining *Barker* factors." *Sutton*, 862 F.3d at 558 (citing *Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992).

The second *Barker* factor, reason for the delay, weighs heavily against Harris. In assessing this factor, "the court considers who is most at fault—the government or the

---

[4]    The Speedy Trial Act "protects against delay from the time of indictment or appearance," while the Sixth Amendment "protects against delay from the time of arrest when it occurs before indictment or appearance." *Sutton*, 862 F.3d at 558 n.7. Here, indictment preceded arrest so the same time period applies to both claims.

defendant." *Brown v. Romanowski*, 845 F.3d 703, 714 (6th Cir. 2017) (citing *United States v. Schreane*, 331 F.3d 548, 554 (6th Cir. 2003)). Fault is largely, if not entirely, attributable to Harris. Harris has asked this Court for at least five continuances since May 10, 2024. *See* Docs. 22, 25, 27, 29, 31. The length of those continuances were based on the needs expressed by his former counsel, who was acting diligently. The Government and Harris jointly requested continuances once or twice but there were no objections to the speedy trial clock being tolled during those periods. These joint continuance requests are not the type of delay that would weigh heavily, if at all, against the Government. *See Brown*, 845 F.3d at 714 ("Governmental delays motivated by bad faith, harassment or attempts to seek a tactical advantage weigh heavily against the government."); *Sutton*, 862 F.3d at 559 ("Negligence and unexplained delays weigh less heavily against the government, but remain relevant . . . .").

More to the point, at the request of Harris, this case had been set for a combined change of plea and sentencing hearing on March 4, 2025. Doc. 37. The Court and the Government were prepared to proceed, but before that hearing, Harris asserted his right to self-representation and expressed a desire to file pretrial motions. As a result, the Court converted the scheduled hearing to a change of plea hearing only and set a deadline for Harris to file pretrial motions. Then, on February 20, 2024, only days before asserting a Sixth Amendment violation, Harris asked for more time to file pretrial motions. Doc. 38. To allow Harris adequate time, the Court had to vacate the change of plea hearing. Harris did not object to that action. Harris, especially as of late, is solely responsible for the delay.

The third *Barker* factor, the defendant's assertion of his speedy trial right "is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." *Barker*, 407 U.S. at 531–32. "Although a defendant does not waive the right to a speedy

trial by failing to assert it, the degree to which the defendant has asserted the right is one of the factors to be considered in the balance." *United States v. Brown*, 169 F.3d 344, 350 (6th Cir. 1999) (citing *Barker*, 407 U.S. at 531–32). Harris has expressed to the Court, both through former counsel and while representing himself, that he does not intend to go to trial and that he intends to plead guilty. Harris's decision to seek more time to file pretrial motions has inevitably delayed his change of plea hearing. Doc. 43. This Court cannot square the instant motion with his request for more time to file pretrial motions. The third factor in no way favors Harris.

As for the fourth and final *Barker* factor, prejudice, the Supreme Court instructs trial court to focus this analysis on these three interests: (1) preventing oppressive pretrial incarceration, (2) minimizing anxiety and concern for unresolved criminal charges, and (3) minimizing damage to the defense. *Barker*, 407 U.S. at 532. Keeping in mind that Harris has been detained pending trial, the Court still cannot reasonably find that this factor favors Harris. Harris has expressed that he does not want a trial and despite wanting to proceed with a guilty plea, Harris has taken actions inconsistent with his right to a speedy trial. Harris has not, in his motion or otherwise, demonstrated that he has suffered damage to his defense, nor that the Government has sought or obtained any unfair trial advantage based on the delays. The Court thus finds no Sixth Amendment violation. Harris's motion (Doc. 42) must be denied in its entirety.

### B. As-Applied § 922(g)(1) Challenge (Doc. 39)

In another motion, Harris contends that the offense charged is unconstitutional as applied to him because it violates his Second Amendment rights.

The Second Amendment of the Constitution states that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. In recent decades, the Supreme Court has interpreted the Second Amendment as protecting an individual person's "right to possess and carry weapons in case of confrontation" unrelated to militia service. *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 4 (2022) (quoting *Dist. of Columbia v. Heller*, 554 U.S. 570, 592 (2008)). *See* ADAM WINKLER, GUN FIGHT: THE BATTLE OVER THE RIGHT TO BEAR ARMS IN AMERICA 95 (2013) (explaining that the Second Amendment was understood as a mechanism to keep the federal government from disarming militias until the 1960s, when scholars began advancing the now-embraced "individual rights" theory). This means that an individual person can keep weapons in "common use" for "lawful purposes." *Heller*, 554 U.S. at 624–25, 627 (citation omitted). But as with most rights, "the right secured by the Second Amendment is not unlimited." *Id.* at 626.

How courts should evaluate the constitutionality of laws passed by Congress or other legislative bodies constraining the possession or carrying of firearms has endured continuing debate. In *Heller*, the Supreme Court established a starting point: "constitutional text and history." *Bruen*, 597 U.S. at 22. Later in *Bruen*, the Supreme Court set forth a new two-step framework. First, the district court must decide whether the "plain text" of the Second Amendment "covers an individual's conduct." *Id.* at 17. "More specifically, we ask if the defendant is part of 'the people' and if the 'right' they assert is 'to keep and bear Arms,' as defined in *District of Columbia v. Heller*." *United States v. Morton*, 123 F.4th 492, 496 (6th Cir. 2024) (internal citations omitted). The right to "keep and bear arms" is ultimately limited by an assessment of whether the weapon is in "common use" and "typically possessed by law-

9

abiding citizens for lawful purposes," particularly for self-defense. *Heller*, 554 U.S. at 624–25 (internal citations omitted). If the district court finds that the Second Amendment's text does in fact cover a person's conduct informed fundamentally by these definitions, then the law is presumptively unconstitutional, and the Government has the burden of proving "that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* "Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individuals' conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

Two years after establishing the *Bruen* framework, the Supreme Court sought to clarify the Second Amendment landscape in *United States v. Rahimi*, 602 U.S. 680 (2024). In *Rahimi*, the Supreme Court explained that a district court "must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" 602 U.S. at 692 (citation omitted). And under *Rahimi*, a challenged regulation need not "precisely match its historical precursors" to be "analogous enough to pass constitutional muster," nor must it be a "dead ringer" or a "historical twin" so long as the law comports with the principles underlying the Second Amendment. *Id.*

The Sixth Circuit relied on the foundation set forth in *Heller, Bruen* and *Rahimi* when evaluating the constitutionality of § 922(g)(1) in *United States v. Williams*, 113 F.4th 637 (6th Cir. 2024). There, the Sixth Circuit held that § 922(g)(1) "is constitutional on its face and as applied to dangerous people." *Id.* at 662. With the door left open to as-applied challenges, courts now must decide case-by-case whether a felon "has met his burden to demonstrate that he is not dangerous." *Id.* at 657. To answer that question, *Williams* directs district courts to

"make fact-specific dangerousness determinations after taking account of the unique circumstances of the individual, including details of his specific conviction." *Id.* at 663.

*Williams* does not require that these determinations be made in a vacuum, nor does it mandate "categorical" matches of dangerousness. *Id.* at 660. *Williams* instead urges courts to make "informed judgments about how criminals commonly operate." *Id.* This may be aided by considering "evidence of past convictions in the record, [and] other judicially noticeable information—such as prior convictions." *Id.* And on that score, "courts may evaluate a defendant's entire criminal record—not just the specific felony underlying his section 922(g)(1) prosecution." *Id.* at 663. Alongside that guidance, *Williams* described three categories of crimes that may inform an individualized dangerousness determination. One category includes "crimes against the person," like murder, rape, assault and robbery. *Id.* at 658. Another category encompasses crimes that "inherently pose a significant threat of danger" even absent "an immediate and direct threat of violence against a particular person," such as burglary and drug trafficking. *Id.* at 659. The final category covers crimes that "pose no threat of physical danger, like mail fraud, tax fraud, or making false statements." *Id.* at 663. While the third category may involve crimes that do not render a person dangerous, *id.* at 559, the Sixth Circuit in *Williams* made clear that a felon in the first or second categories "will have a very difficult time, to say the least, of showing he is not dangerous." *Id.* at 663.

With all of that background in mind, the Court turns to the § 922(g)(1) challenge here. Harris does not bring a facial challenge, which would fail under *Williams*. *See, e.g.*, *United States v. Watson*, No. 24-3002, 2025 WL 833246, at *1 (6th Cir. Mar. 17, 2025) (An "argument to the contrary faces the insurmountable obstacle of binding precedent" in *Williams*). Instead,

he brings an as-applied challenge arguing that he is not dangerous—though he conveniently does not recount his prior convictions or address his offense conduct. Doc. 39, PageID 120.

The alleged offense conduct here is alarming to put it mildly. *Williams*, 113 F.4th at 657 ("[C]ourts may wish to consider information beyond criminal convictions when assessing a defendant's dangerousness."); *see United States v. Fordham*, No. 24-1491, 2025 WL 318229, at *5 (6th Cir. Jan. 28, 2025) (considering the offense conduct when assessing dangerousness under an as-applied challenge to § 922(g)(1)). Possessing or carrying a firearm as a felon is troubling in and of itself—but that concern is more heightened when that felon is alleged to have *discharged* the firearm in a firefight involving several individuals at a time and place when potential for harm to the public is at its peak. Gov. Ex. 1, Doc. 59, PageID 267; Gov. Ex. 2, Doc. 59, PageID 268. And worse yet, Harris allegedly shot someone in the process and then tried to flee. *See* Doc. 59, PageID 264. Thus, if convicted, this would constitute strong evidence that Harris is dangerous. *See United States v. Vaughn*, No. 23-5790, 2024 WL 4615853, at *2 n.2 (6th Cir. Oct. 30, 2024) ("The fact that Vaughn's § 922(g)(1) conviction resulted from an incident where he shot at an individual certainly would lend to a showing of his dangerousness.").

Offense conduct aside, Harris has a wide array of prior convictions, including convictions for disorderly conduct, carrying concealed weapons (merged with tampering with evidence), criminal damaging and obstruction, weapons under disability, attempted escape, failure to comply, and driving under suspension. Doc. 11, PageID 16–19.

Turning first to the escape conviction, court records show that Harris was originally charged under Ohio law with attempted murder, a first-degree felony, in violation of O.R.C. § 2903.02 before being indicted in October 2013 on an escape charge, a second-degree felony,

in violation of O.R.C. § 2921.34(A)(1). *State of Ohio v. Harris*, CR 2013 09 1549 (Butler County C.P.). He later pleaded guilty to attempted escape and was sentenced to 36 months in prison.

To be indicative of dangerousness, a conviction does not have to qualify as a crime of violence—though consistent with historical tradition, "there is little debate that violent crimes are at least strong evidence that an individual is dangerous." *Williams*, 113 F.4th at 658. An escape charge under Ohio law does not automatically qualify as a crime of violence—instead such a determination depends on the nature and circumstances of the offense. *See United States v. Gross*, 662 F.3d 393, 407–08 (6th Cir. 2011); *see also United States v. Peyton*, 183 F. App'x 539, 550–51 (6th Cir. 2006) ("In Ohio, the crime of escape is defined broadly enough to encompass both violent and non-violent conduct."). Beyond the judicially noticed indictment and plea documents, which lack factual recitation, there are few details available in the state court records related to Harris's attempted escape conviction making it difficult to decide whether the conduct underlying his conviction more closely resembled a non-violent walkway escape or an escape that was "purposeful, violent, and aggressive" so as to qualify as a crime of violence. *United States v. Ford*, 560 F.3d 420, 425 (6th Cir. 2009). But the difficulty is made easier by the original charge lodged against Harris: attempted murder. This suggests that his escape was more like an escape that was "purposeful, violent, and aggressive" and therefore likely qualifies as a crime violence, which is strong evidence of dangerousness under *Williams*.

But even if Harris's attempted escape conviction were to fall short of fitting into the category of "purposeful, violent, and aggressive" conduct, and therefore unlikely to qualify as a crime of violence, it was certainly not an isolated incident and clearly not the only one of his convictions that, at the very least, carried a risk of danger to others. *See Williams*, 113 F.4th at 659 (explaining that crimes that put someone's safety at risk "justify a finding of danger").

13

Several months prior to being convicted of attempted escape, Harris was convicted of carrying concealed weapons, which poses a significant risk of danger. *State of Ohio v. Harris*, CR 2012 12 2021 (Butler County C.P.); *see United States v. Flores*, No. 24-20579, 2025 WL 348390, at *2 (E.D. Mich. Jan. 30, 2025) ("The presence of unregistered deadly weapons, carried by individuals who are violating the law, presents the potential for significant danger."); *see also United States v. Lownsbury*, No. 5:22-cr-41, 2024 WL 4264970, at *7 (N.D. Ohio Sept. 23, 2024) (finding that a felony conviction for carrying a concealed weapon poses a significant threat of danger to the community). After that conviction, Harris was sentenced to probation/community control but violated the terms of his probation only a month later by incurring new charges that resulted in convictions for criminal damaging and obstruction for which he received a term of 90 days confinement. *State of Ohio v. Harris*, CRB1302255 (Hamilton Mun. Ct.). Harris's probation for his concealed weapons charge was also revoked and he was sentenced to a term of imprisonment to run concurrent to the 36 months imposed on his attempted escape charge and a 24-month sentence imposed on yet another offense: having weapons under disability. *State of Ohio v. Harris*, CR 2013 12 2002 (Butler County C.P.); *see Williams*, 113 F.4th at 662 (reasoning that the government could have pointed to any one of the defendant's prior convictions, including his prior felon in possession conviction, to demonstrate his dangerousness). These offenses are on top of his other convictions for disorderly conduct and failure to comply, which also inform this dangerousness determination. *See* Doc. 11.

In undertaking the "fact-specific dangerousness determination" that *Williams* requires, the Court finds that Harris has not met his burden of showing that he is not dangerous. *Williams*, 113 F.4th at 660. The bulk of Harris's convictions may not fit squarely within the

14

categories that the Sixth Circuit established in *Williams* but this Court is convinced after considering the trail of unlawful activities Harris has been engaged in, including the alleged offense conduct and his past convictions, the facts presented here clearly justify a finding of dangerousness. Harris's as-applied challenge therefore fails.

### C. Due Process Violations (Doc. 39), Lack of Subject Matter Jurisdiction (Doc. 60), Improper Venue (Doc. 53), Selective Prosecution (Doc. 40), and Vindictive Prosecution (Doc. 41)

Harris has filed several other motions seeking to dismiss this case for due process violations, lack of subject matter jurisdiction, improper venue, and selective and vindictive prosecution. Harris relies on a prior state court prosecution to advance these arguments. At the time he was indicted federally, Harris had two pending charges in Ohio for having weapons while under disability. Doc. 11. The charges there and the charge here arise from the same conduct. Harris's state charges have since been dismissed.

#### 1. Due Process Violations

Harris argues that this case began before the state of Ohio "relinquished its primary custody" over him in violation of his due process rights. Doc. 39, PageID 118. His primary complaint in this respect is that the Court "never executed the writ of habeas corpus ad prosequendum" necessary to gain temporary custody or jurisdiction over him. *Id.*

Harris views a writ of habeas corpus ad prosequendum as something it is not. Simply stated, "[a] federal writ of habeas corpus ad prosequendum is a court order directing the production of a prisoner to stand trial in federal court." *Ridgeway v. United States*, 558 F.2d 357, 361 (6th Cir. 1977); *see also United States v. Kelly*, 661 F.3d 682, 687 (1st Cir. 2011) (explaining a writ of habeas corpus ad prosequendum "requires only a temporary physical transfer of *an already detained* individual") (emphasis added). Harris was released on bond by

15

the state of Ohio. In other words, he was not in state custody and was not a prisoner or otherwise detained by the state at the time he was brought before this Court. As such, there was no need for a writ.

But let's assume for a moment that Harris was being held in state custody without bond and this Court had issued a writ of habeas corpus ad prosequendum. Even then, the state of Ohio "did not have to completely relinquish its jurisdiction over [Harris] for him to properly come before this Court for prosecution." *United States v. Hubbard*, No. 5:19-CR-00060, 2020 WL 6546305, at *3 (W.D. Ky. Nov. 6, 2020). Because this nation is one of dual sovereigns, the state of Ohio and the federal government "each may initiate its own criminal prosecutions for the same conduct when a person's actions constitute offenses under the laws of both jurisdictions." *United States v. Moore*, No. 1:23-cr-47, 2024 WL 3324817, at *1 (S.D. Ohio July 2, 2024) (citing *Gamble v. United States*, 587 U.S. 678, 685–88 (2019)). That is what occurred here. Harris's motion to dismiss on this basis must therefore be denied.

### 2.  Lack of Subject Matter Jurisdiction

Harris's motion to dismiss for lack of subject matter jurisdiction must be denied for similar reasons. Federal district courts have jurisdiction over "all offenses against the laws of the United States." 18 U.S.C. § 3231. The indictment alleges that Harris violated federal law by possessing a firearm as a prohibited person. Doc. 1. That Harris may have violated a state law based on the same offense conduct is of no consequence because the state of Ohio and the federal government may each prosecute Harris for the same conduct. *Moore*, 2024 WL 3324817, at *1 (citing *Gamble*, 587 U.S. at 685–88). Further, as is the case here, "dismissal of a state court complaint based on similar charges does not foreclose this Court's exercising

16

jurisdiction over a valid federal indictment." *Id.* (citing *United States v. Kendrick*, 853 F.2d 492, 495–96 (6th Cir. 1988)). Accordingly, his attempt to dismiss on this basis lacks merit.

### 3. Improper Venue

Harris next contests venue. He argues that this case must be dismissed because the events underlying his indictment occurred in Butler County, Ohio. Doc. 53, PageID 239–40. Thus, he reasons that venue is proper in the Butler County Common Pleas Court, not the United States District Court for the Southern District of Ohio. But the law on this point is clear: for violations of federal law, venue is proper in the district where the offense was committed. U.S. Const. art. III, § 2, cl. 3; *see also* Fed. R. Crim. P. 18 ("Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed."). Harris is alleged to have committed a federal offense in Butler County, Ohio, which is located in the Southern District of Ohio. Doc. 1. As a result, venue is proper, so Harris's motion to dismiss for improper venue must also be denied.

### 4. Selective and Vindictive Prosecution

Harris has also filed two related motions asking for dismissal based on selective and vindictive prosecution. In these motions, Harris alleges that the Government has engaged in selective and vindictive prosecution because the state of Ohio asked the Government (*i.e.*, the United States Attorney) to prosecute this case based on concerns of Harris raising self-defense. Doc. 40, PageID 122; Doc. 41, PageID 124. Thus, he appears to allege that the Government agreed to prosecute this case in order to deprive him of his right to claim self-defense. *Id.* He also alleges that he was treated differently than the other individuals involved in the events underlying the instant offense because none of those individuals were indicted by the Government after being charged by the state of Ohio. *Id.*

17

To begin with, Harris appears ignorant to the fact that federal defendants are not categorically barred from asserting a justification defense. The Sixth Circuit held in *United States v. Singleton*, 902 F.2d 471, 472 (6th Cir. 1990) that "a defense of justification may arise in rare situations" where a felon is found to be in possession of a firearm. If a defendant intends to go to trial, he may ask that the court permit him to argue justification as a defense and that the jury be instructed accordingly. To do so, a defendant must state a *prime facie* case of justification by offering some evidence in support of these elements: "(1) defendant was under an unlawful and present, imminent, and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury; (2) defendant had not recklessly or negligently placed himself in a situation in which it was probable that he would be forced to choose the criminal conduct; (3) defendant had no reasonable, legal alternative to violating the law, a chance both to refuse to do the criminal act and also to avoid the threatened harm; (4) a direct causal relationship may be reasonably anticipated between the criminal action taken and the avoidance of the threatened harm; [and] [(5)] [defendant] did not maintain possession any longer than absolutely necessary." *United States v. Hargrove*, 416 F.3d 486, 490 (6th Cir. 2005) (citing *Singleton*, 902 F.2d at 472–73).

Harris has not signaled an intent to present a justification defense, let alone an intention to go to trial.[5] In fact, Harris has advised the Court repeatedly that he intends to resolve this case through plea if his pretrial motions to dismiss do not succeed. Hearing Tr., Doc. 50, 7:18–45. Thus, Harris cannot say at this point that he has been deprived of any right related to any possible defenses that he may wish to pursue at trial.

---

[5] The Government concedes that it does not believe that Harris can satisfy his burden under *Singleton*. Doc. 45, PageID 155.

That issue aside, for selective prosecution Harris must show that "the federal prosecutorial policy 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" *United States v. Armstrong*, 517 U.S. 456, 465 (1996). He has not done so. Harris is one of many defendants in the Southern District of Ohio charged under § 922(g)(1), and like many similar defendants, Harris has a lengthy criminal history. The Government represents that it agreed to prosecute Harris under the Protect Safe Neighborhoods ("PSN") initiative, which according to the Government, brings focus upon violent criminals to address local violent crime alongside state and local officials.[6] Doc. 45, PageID 152. It is well understood that federal prosecutions tend to carry stiffer penalties, which motivates the Government to pick up cases that could otherwise remain in the state system to offer specific and general deterrence and reduce crime in local communities. The Government therefore had a legitimate basis for choosing to prosecute an "armed felon" like Harris "who create[s] a danger to society." *Id.* at 154. Thus, Harris has not shown that impermissible considerations motivated this prosecution, nor that similarly situated individuals who could have been charged were not similarly prosecuted. *See United States v. Edwards*, 783 F. App'x 540, 546 (6th Cir. 2019) (citing *United States v. Jones*, 159 F.3d 969, 977 (6th Cir. 2019)).

Harris has not proven vindictive prosecution either. To do so, Harris must show "(1) exercise of a protected right; (2) a prosecutorial stake in the exercise of that right; (3) unreasonableness of the prosecutor's conduct; [and] (4) the intent to punish the defendant for exercise of the protected right." *United States v. Suarez*, 263 F.3d 468, 479 (6th Cir. 2001). Harris appears to be relying on his right to assert self-defense—though, as noted earlier, he has expressed no intent to go to trial, nor that he wishes to pursue a justification defense. As

---

[6]   Information about the initiative is available here: https://www.justice.gov/psn (last visited April 29, 2025).

a result, he fails to show the first element, that he exercised a protected right. Along those same lines, Harris has not shown that the Government has any particular "stake" in preventing his assertion of this right given that he has not attempted to do so.

For these reasons, Harris has not shown selective or vindictive prosecution.

### D. Prosecutorial Misconduct (Doc. 54)

Harris separately alleges prosecutorial misconduct. Dismissal of an indictment for prosecutorial misconduct may be appropriate where "'outrageous government conduct' results in a violation of a defendant's right to due process," *United States v. Leedy*, 345 F. Supp. 3d 941, 959 (S.D. Ohio 2018) (quoting *United States v. Napier*, 787 F.3d 333, 341 (6th Cir. 2015)). Conduct may rise to the level of a due process violation if it is "so outrageous that it violates 'fundamental fairness' or is 'shocking to the universal sense of justice.'" *Napier*, 787 F.3d at 341 (quoting *United States v. Russell*, 411 U.S. 423, 432 (1973)). But even then, there must be some showing of prejudice to the defendant. *United States v. Adamo*, 742 F.2d 927, 941 (6th Cir. 1984) (citing *United States v. Nembhard*, 676 F.2d 193, 200 (6th Cir. 1982)). Absent a due process violation, a court may exercise its supervisory power and dismiss an indictment if a defendant has shown (1) "demonstrated and longstanding prosecutorial misconduct" and (2) prejudice to the defense. *United States v. Smith*, 687 F.2d 147, 152–53 (6th Cir. 1982). To succeed, "the defendant must demonstrate that the resulting prejudice has or will actually undermine a fair trial." *Leedy*, 345 F. Supp. 3d at 959 (citing *Adamo*, 742 F.2d at 941).

As part of his claim, Harris argues that the Government made improper and misleading statements about him and the evidence at his detention hearing. He states that these statements were prejudicial to him and resulted in his pretrial detention, rising to the level of a violation of his due process rights. But these allegations do not support a finding of

20

prosecutorial misconduct. Harris has not established that his due process rights have been violated—let alone that the Government has engaged in conduct "so outrageous that it violates 'fundamental fairness' or is 'shocking to the universal sense of justice.'" *Napier*, 787 F.3d at 341 (quoting *Russell*, 411 U.S. at 432). The Government admitted in response to Harris's motion that a misstatement was made in relation to the DNA evidence at the detention hearing. At the hearing, the Government incorrectly represented that Harris's DNA was the major contributor identified on the magazine, when it was identified as the major contributor on the grip of the firearm. Doc. 61, PageID 281. The Court does not see how this minor misstatement would have been prejudicial, especially considering the other evidence that the Government proffered in support of Harris's pretrial detention. Harris has therefore not demonstrated prosecutorial misconduct, so this motion must too be denied.

### E. Detention Hearing and Bond Reconsideration (Doc. 52)

Apart from seeking to dismiss his indictment on various (yet unsuccessful) grounds, Harris seeks to reopen his detention hearing and asks for the Court to reconsider bond (Doc. 52). Harris was ordered detained pending trial at the onset of this case following a detention hearing before the Magistrate Judge. This is his second time challenging that order.

Magistrate judges have the authority to decide whether a defendant should be detained or released pending trial. *See* 18 U.S.C. §§ 3141, 3142. When a magistrate judge orders a defendant detained pending trial under § 3142(e) as a flight risk or danger to the community and the defendant challenges that order before the district court, the "district court reviews [the] magistrate judge's decision *de novo*." *United States v. Parish*, No. 1:21-cr-127-14, 2022 WL 3654892, at *2 (S.D. Ohio Aug. 25, 2022) (quoting *United States v. Rainey*, No. 20-cr-10005-1, 2020 U.S. Dist. LEXIS 89617, at *4 (W.D. Tenn. May 21, 2020)); *see also United States v.*

*Watkins*, No. 13–02, 2013 WL 614252, at *3 (E.D. Ky. Feb. 19, 2013) (noting that while the Sixth Circuit has not directly addressed this issue, "most district courts in the Sixth Circuit have applied the de novo standard of review").

The primary issue here is that Harris has already, while he was represented by counsel, unsuccessfully appealed his detention order. *See* Docs. 16, 21. Because of this, Harris must now persuade the Court that his detention hearing should be reopened pursuant to 18 U.S.C. § 3142(f). *Parish*, 2022 WL 3654892, at *2. That section provides:

> The hearing may be reopened [] at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community.

18 U.S.C. § 3142(f). In this posture, the district court may exercise discretion in deciding whether to reopen the hearing. *United States v. Watson*, 475 F. App'x 598, 601 (6th Cir. 2012).

Harris alleges that he has new information in the form of DNA analysis that was not known to him at the time of the detention hearing. That said, he has not shown that this has a material bearing on whether there are conditions of release that will reasonably assure his appearance and the safety of any other person and the community. As this Court emphasized in its previous order, Harris is alleged to have engaged in a shootout in a public area during the middle of the day that led him to strike one victim. Doc. 59, PageID 264; Doc. 21; Gov. Ex. 1, Doc. 59, PageID 267; Gov. Ex. 2, Doc. 59, PageID 268. The shootout was captured by video surveillance. *See id.* In his motion, Harris does not dispute that he was part of the incident, but he states that his actions were "not an act of violence" but that he "was standing in the defense of others." Doc. 52, PageID 236. Given his admissions, the Court struggles to

reconcile how the new DNA information would have a material bearing on his likeliness to flee or the safety of others and the community under § 3142(f).

Further, Harris's motivations for allegedly possessing and firing a firearm in self-defense and the defense of others does not mean that his actions were not dangerous. *See Vaughn*, 2024 WL 4615853, at *3 n.3 (noting that possessing a gun for self-defense is not, on its own, "sufficient to make out an individualized showing that [the defendant] is not dangerous" under § 922(g)). By allegedly possessing a firearm as a felon and engaging in a firefight near a housing complex playground during the middle of the day, Harris's actions were not only careless, but extremely dangerous. Harris has therefore not shown that the new evidence on which he relies has a material bearing—or really any bearing at all—on whether there are conditions of release that will reasonably assure the safety of other persons and the community, especially considering the recklessness of his alleged behavior. The same is true of reasonably assuring his appearance. Regardless of whether the DNA analysis that Harris relies on favors him,[7] his history evidences a risk of flight. Harris was previously convicted of attempted escape and is alleged to have attempted to flee from the scene of the shooting here. Doc. 11, PageID 16–19. Harris likewise has prior failures to appear and probation violations. The fact that he was granted bond in state court does not move the needle.

Harris has not shown that he is entitled to a reopening of his detention hearing, nor that reconsideration of pretrial detention is appropriate. The motion is denied.

---

[7]  The Government disputes Harris's interpretation of the DNA evidence. The Court takes no position on what the DNA evidence might show as it is immaterial to the present analysis.

### F.   Motion in Limine (Doc. 51)

The last motion to address is Harris's motion in limine where Harris seeks to exclude video evidence under Fed. R. Evid. 404(b). To be clear, the Court has viewed no video evidence and does not have the evidence before it at this time. Based on Harris's and the Government's descriptions, it appears that the video evidence Harris seeks to exclude portrays the shooting that allegedly occurred. Under a generous interpretation of his motion, the Court believes that Harris seeks to exclude the video evidence as evidence of another crime, wrong, or act to prove that he acted in accordance with a particular character trait on a particular occasion. Fed. R. Evid. 404(b)(1). More generally though, Harris alleges that the video evidence presents a danger of unfair prejudice that would greatly outweigh the probative value of that evidence and that it would confuse the issues for the jury. Doc. 51, PageID 232. Based on his arguments, the Court will construe his motion under both Rule 403 and Rule 404(b).

It is premature at this stage to assess the admissibility of the video evidence—though it appears that Harris may have an uphill battle arguing against its admission. An assessment of this evidence is best left for just prior to or at trial when the Court can view the video evidence, assess the nature of the evidence in relation to other evidence, consider the purpose for which the evidence is sought to be introduced, and determine, if necessary, whether a limiting instruction can mitigate any risk of prejudice under Rule 403. *United States v. Asher*, 910 F.3d 854, 860–62 (6th Cir. 2018). The Court will therefore defer a ruling unless or until Harris elects to proceed to trial as is his right under the Sixth Amendment.

## II.  CONCLUSION

As discussed above, aside from deferring a ruling on Harris's motion in limine, the Court **DENIES** all of Harris's pending motions. *See* Docs. 39, 40, 41, 42, 52, 53, 54, 60.

**IT IS SO ORDERED.**

May 1, 2025

Jeffery P. Hopkins
United States District Judge